*Nov. Term, 1858.*

BROWN
v.
KILLIAN.

------

### BROWN and Others *v.* KILLIAN.

Under the present constitution, no bank of issue, except a state bank and free or private banks established pursuant to the provisions of the general banking law, can be established in this state.

Notes in the similitude of authorized bank notes issued by any other bank of this state, to be circulated as money, are void; the issuers are not liable to pay them; and any consideration given for them may be recovered back.

APPEAL from the *Owen* Court of Common Pleas.

PERKINS, J.—This is a suit to recover the amount of certain notes purporting to be issued by the *Citizens' Bank of Gosport.* The suit is against the stockholders of the bank in their individual capacity. The main ground of defense is that the bank is an illegal institution, and its

*Saturday, January 8, 1859.*

issues void. The bank was organized by an association of individuals, for the purpose of doing a general banking business, including the issuing of notes to circulate as money. Engraved plates were procured, bills of various denominations, payable to bearer, in the exact similitude of bank notes, printed, issued, and put into circulation by the company. No securities were filed with the auditor of state. The organization was not, and was not intended to be, in pursuance of any statute law. And these questions are presented by the case—

1. Is the right to issue bills, to circulate as money, a natural or common-law right?

2. If so, is it placed under restrictions by our constitution and statutes?

3. If so, and the bills were issued without authority of law, are the issuers legally liable to pay them?

Banking originated in the exercise of a natural or common-law right, as does, perhaps, every other pursuit, and was called into existence by the wants of the public. It at first consisted in receiving money on deposit, loaning it to customers, buying and selling bills of exchange, &c. For money deposited, the bankers gave notes or certificates. These passed from hand to hand, represented actual cash, were called bank or bankers' notes; and, hence, as a bank note, in its origin, represented money, bank notes came, by usage, to be considered as and taken for money. Subsequently, with the growth of commerce, bankers adopted the practice of issuing their notes, not for sums of money actually deposited, but upon their own credit, made payable to bearer. These notes circulated as money. The issue of such notes, it seems, according to the *National Cyclopædia*, was engrafted upon the business of private banking. But, in 1694, the *Bank of England* was established by the government; and to protect it in the enjoyment of its privileges, private banking in *England* passed under the control of statutes, and the right in private bankers to issue paper as a circulating medium, was restricted. It ceased, in that country, to be exercised, and strictly private banking became limited to the func-

tions of banks of deposit and discount. See Wharton and Bouvier's Law Dictionaries, the *Cyclopædia, supra,* and *Davis* v. *McAlpine,* 10 Ind. R. 137.

At the period of the establishment of business houses in the *North American* colonies, private banks in *England* did not practice issuing paper to be used as currency. The first issues of paper money here were made by the colonial and continental governments, and the second, and all or nearly all, subsequent issues, were by banks chartered by those or succeeding state or national governments. It may be laid down as a general proposition, that, in this country, paper money has been issued only by government, or by banks authorized by government. Such has been the practice in this state, and perhaps it might be safely asserted that the common-law right of issuing such paper by private bankers never had an existence in this country. But without determining this point, we proceed to inquire whether the right exists under the present constitution and laws of *Indiana.*

The subject of banking was a prominent one before the convention that framed our present constitution. The members were divided upon it into three parties—

1. The hard money men—opposed to all bank paper—all banks of issue.

2. Those who wished the issue of such paper to be confined exclusively to a bank chartered by the state.

3. Those who were opposed to any monopoly in the business, but desired it should be open to all the citizens—that banks should be organized upon free trade principles.

The two parties favoring banks of issues, introduced their respective propositions—one for a state bank, the other for free banks. The latter was in these words:

"The business of banking shall be free to all, on such terms and restrictions as the legislature shall impose, by general laws, for such purpose, including the following principles, which shall be obligatory upon all persons, associations, or corporations acting under such general laws." Deb. Con., vol. 2, p. 1414.

In discussing the subject, some of the members of the

convention appeared to regard the right to issue bank paper for purposes of circulation as a franchise to be granted by the government; others as a natural or common-law right, but one so liable to abuse, as to require stringent restrictions upon its exercise. Thus Mr. *Rariden* said:

"The free system is based upon the natural rights of man under the idea that what is done by man as a citizen may be done by man as a banker. Its friends say they only want to negative certain rights and powers in that branch of business—that it is to be left open and free to all—that whosoever will pledge securities, &c.—this is called free to all."

Mr. *Kelso*.—"The plan, as I understand it, is this, or about this: A general law is to be passed by the legislature, authorizing any and all, who choose, to go to banking; not, however, without restrictions; and one of their strongholds is the security they offer to the billholder."

Judge *Howe*.—"Now, as to the question of monopoly, that also will be entirely obviated. Under a law of this kind, every one will have a right to bank if he has money enough. All the privileges that have ever been given to a bank are the rights to sue and be sued in its corporate capacity, and to issue bills. The right of banking is a right which every man has at common law, and this system, instead of extending the right, restricts it. It is a restriction of all banking."

Professor *Reed*.—"I shall, sir, favor those restrictions which, in my opinion, will the most certainly secure these principles, [a return to a specie currency, &c.,] and at length bring the country to the true commercial and constitutional medium of exchange. By the general adoption of a species of securities which will gradually disappear, this object will be accomplished, and banking will be restored to its legitimate sphere, which is not the emitting and circulation of bills of credit."

Other members expressed like sentiments. Deb. Con., vol. 2, pp. 1414 to 1640.

It clearly appears from the whole discussion, that those members who regarded the right to issue bills as a fran-

chise, considered that it could only be exercised, as of course it could only be, under a grant from the legislature; and that those who held it a natural right, regarded the constitution they were framing as a restriction upon the exercise of the right otherwise than in a manner to be prescribed by the legislature. Both regarded the constitution as controlling the subject.

When the propositions came to a vote, the hard money men voted with the free bank men against the state bank section, and with the state bank men against the free bank section, and thus at first defeated both. The free and state bank men then combined and adopted both sections, substantially as introduced.

They provide that the legislature may create a state bank by charter of incorporation, with power to issue bills. This was the proposition of the state bank men. And, also, that "No banks shall be established otherwise than under a general banking law except" a state bank; which "law shall provide for the registry and countersigning, by an officer of state, of all paper credit designed to be circulated as money," &c. This was the proposition of the free bank men. Const., art. ix.

This historical view enables us at once to determine the effect to be given to the section of the constitution touching general banking. It was designed to operate on individuals as well as upon the legislature. It prohibits all banking, by way of issuing bills, except in the mode prescribed by statute. It must, by its terms, prohibit general or free banking in any other mode, for the reason that free banks are not, and cannot be established by the legislature. That body can only prescribe the terms, conditions, and mode upon and in which individuals may establish them. The legislature can only establish, in the strict sense of the term, a bank, by granting a special charter. It does not thus establish free banks. Individuals establish them.

Accordingly, we find that the legislature has enacted a general law, entitled "An act to authorize and regulate the business of general banking," which provides that "any

number of persons, not less than eleven," may, under prescribed regulations, establish a bank, &c.

It seems to us, upon a view of the whole matter, clear beyond doubt, that no bank of issue can be established in this state under our present constitution, except a state bank, and free or private banks pursuant to the provisions of the general banking law.

This being the case, it follows that the *Citizens' Bank of Gosport* is an illegal institution; and further, that because of its illegality, its issues are void. See *Curtis* v. *Leavitt*, 15 New York R. (Smith) p. 1.—*Lawler* v. *Burt*, 7 Ohio State R. 340.—*Smead* v. *The Indianapolis, &c., Railroad Co.*, at this term (1). And being void, the law is well settled that they cannot be made the foundation of an action. Any consideration given for them may be recovered back; but a suit on the bills is not maintainable.

We have no statute, it may be remarked, as we ought to have, making it a penal offense to issue such paper; hence its issuers cannot be punished; but being inhibited by the constitution, and impliedly by statute, though not under a penalty, they are illegal and void.

Since this cause was submitted here, the legislature has enacted a law as follows:

"An act to enable the holders of unauthorized paper money to collect the amount thereof, from any person, company, or corporation heretofore or hereafter issuing or aiding in the issue or circulation thereof.

"Section 1. *Be it enacted by the General Assembly of the State of Indiana*, That any person, company, or corporation, not authorized by the laws of this state, or any other state of the *United States*, who have made, issued, or circulated, or caused to be made, issued, or circulated, any bill, note, or promise to pay, in the nature, similitude, or likeness of paper currency, or bank bills, shall forfeit and pay, by way of civil damages, to any person holding the same, and who has received the said bills or notes in the course of business, and for which a valuable consideration has been paid or parted with, the full amount of the face thereof.

Nov. Term, 1858.

BROWN v. KILLIAN.

"Sec. 2. Any person, company, or corporation, not authorized by the laws of this state, or any other state of the *United States*, who shall make, issue, utter, or circulate, or cause to be made, issued, uttered, or circulated, any bill, note, or promise to pay, in the nature, similitude, or likeness of paper currency, or bank bills, shall forfeit and pay, by way of civil damages, to any person holding the same, and who has received the said bills or notes in the course of business, and for which a valuable consideration has been paid or parted with, the full amount of the face thereof.

"Sec. 3. Be it further enacted, that any person, company, or corporation, who have heretofore made, issued, uttered, or circulated, or caused the same to be done, any such bill, note, or promise to pay, as in the last preceding section described, and who shall, hereafter, in any manner, aid or encourage the further circulation of the same, either by holding out a promise that the same shall be redeemed, or otherwise, shall forfeit and pay by way of civil damages, to any person holding the same, and who has received the said bills or notes, in the course of business, and for which a valuable consideration has been paid or parted with, the full amount of the face thereof.

"Sec. 4. In all prosecutions under the preceding sections of this act, the notes or bills as therein described, shall be received as evidence of the amount of damages the plaintiff is entitled to recover, and in any such trial, it shall not be necessary to prove the execution of such bills or notes, unless the same is denied under oath. Provided, however, that if any bill, note, or promise to pay, as described in this act, shall be lost or destroyed, or shall be in the possession of the person, company, or corporation, who issued the same, or any officer, or agent, or member, of such company or corporation, such person, company, or corporation, not having redeemed the same, the same may be sued upon as a lost instrument, and it shall not be necessary to produce upon trial such bill, note, or promise to pay.

"Sec. 5. Inasmuch as a large amount of unauthorized

paper currency is now in circulation throughout the state, and the holders thereof unable to collect the same, it is hereby declared that an emergency exists requiring the immediate taking effect of this act, and the same shall, therefore, be in force from and after its passage and publication in the *Indiana State Journal* and the *Indiana State Sentinel.*

" Approved *December* 23, 1858."

This act was published on the 24th of *December*, 1858, and is, therefore, now in force; but it cannot influence the decision of the cause now before us. See, as to the remedy under it, *Lawler* v. *Burt, supra.*

*Per Curiam.*— The judgment is reversed with costs. Cause remanded, &c.

*W. M. Franklin*, for the appellants.

*J. H. Martin*, for the appellee.

(1) *Ante*, 104.