MERCHANTS & MANUFACTURERS' BANK v. CHARLES STONE, WILLIAM LIVINGSTONE JR. AND EDWARD T. HUGHES.

*De facto corporations not to be treated as partnerships.*

Where a body professing to be a corporation has been dealt with expressly as such, those who have so dealt with it cannot question its corporate existence for the purpose of charging its members individually as if they were partners.

Error to Superior Court of Detroit. Submitted February 1. Decided June 5.

ASSUMPSIT. Plaintiff brings error.

*Griffin & Dickinson* and *William Jennison* for plaintiff in error. Where there has been no corporate act in good faith, the corporate character is not acquired either *de jure* or *de facto*, *Unity Ins. Co. v. Cram*, 43 N. H., 636; *Harris v. McGregor*, 29 Cal., 124; *DeWitt v. Hastings*, 40 N. Y. Sup. Ct., 463; *Abbott v. Omaha S. Co.*, 4

Neb., 416; *Paterson v. Arnold*, 45 Penn. St., 410: contra, *Cochran v. Arnold*, 58 Penn. St., 399.

*G. V. N. Lothrop* for Charles Stone, defendant in error. They who have dealt and contracted with a body as a corporation are estopped from denying its legal existence, *Armstrong v. Harvey*, 11 Ohio St., 527; it is only where there is no color of corporate organization that all the parties acting jointly can be considered as joint contractors or partners, *Childs v. Smith*, 55 Barb., 45; *Fuller v. Rowe*, 57 N. Y., 23; *Nat. Bank v. Landon*, 45 N. Y., 410; where there was a promise by a *de facto* corporation, the corporators could not be held as partners, *Cent. City Savings Inst. v. Walker*, 5 Hun, 34: 66 N. Y., 424; *Fay v. Noble*, 7 Cush., 188.

GRAVES, J.    During the period between the summer of 1871 and the fall of 1875, the bank transacted a large amount of business in the way of discounting paper and otherwise with a concern appearing to the bank and the public and purporting to be a corporation bearing the name of "The Charles Stone Timber Company," and all this business was undertaken and prosecuted by the bank upon the specific understanding that the concern was contracting as a corporation and not otherwise. Indeed the bank dealt with it throughout as a corporation in fact and without any qualification or reserve, recognized it as one.

In the course of this business and in the fall of 1875 there remained a note in the hands of the bank for $4000, which the company had made to it in renewal of one previously discounted.    It was signed "The Chas. Stone Timber Co., W. Livingston, Jr., Treasurer," being the usual style.    The company failing to pay, the bank sued the defendants upon the money counts alone, and set forth a copy of the note in the usual manner with notice that the original would be given in evidence against the defendants under said money counts.    The defendants were only charged as individuals.    They

were not described in the declaration as members of a firm. Neither was there any averment that they were sued upon any special liability or undertaking, or any undertaking made by them in any peculiar character. Hughes was not served.

Livingston pleaded discharge in bankruptcy and Stone pleaded the general issue and made affidavit denying execution of the note. The bank contended that the company was not a corporation but was a private co-partnership composed of defendants and on that theory endeavored to recover upon the note against defendants in this form of proceeding.

Stone controverted the position so taken by the bank.

In view of the issue and state of facts it was incumbent upon the bank to establish that the company represented by the signature to the note, was a co-partnership; that the defendants were the partners, and that the note was made by the firm. The style of the company was of equivocal import. It might denote a corporation or it might denote a co-partnership. The mere name then was indeterminate in that regard. By itself it gave no clue to the nature of the company as being incorporated or unincorporated. The burden of proof was on the bank to show that it was a mere private firm composed of defendants. But it was unable to make any advance towards proof of the affirmative of that issue except by showing articles of association made and filed by defendants under the law of the State for forming corporations; that the company had not assumed to act as a co-partnership, but under the name of "The Charles Stone Timber Company," being the title adopted by the articles, had assumed in fact to proceed as a corporation and for a series of years had in such name and character carried on a business not only large in amount but extensive in view of the number and variety of the transactions, and moreover had expressly acted in such character in giving the note in question to the bank. The bank took the ground that

the proceedings to incorporate were not valid; that the business carried on was not in just construction within the articles or the statute; that the company was not a corporation in point of fact, and that the defendants, who were the only members, were in consequence responsible in character of partners for the undertaking of the company.    Now the proof that as matter of fact the company carried on business as a corporation in the name of "The Charles Stone Timber Company" when the bank dealt with it, established *prima facie* that it was a corporation pursuant to law (Act 109 of 1871, vol. 1, p. 176) and certainly the evidence the bank adduced in regard to the operations of the company, the attitude it maintained and the character in which the two concerns dealt together showed that the company was a corporation *de facto*, and so acknowledged by the bank.    In short the company was *prima facie* a lawful corporation when the note was taken, and the bank admitted in the very transaction that it was one in fact, and that admission cannot be disputed in this collateral way in order that the bank may call in question the corporate existence of the company and charge against the individual members the precise obligation which was unequivocally accepted as a corporate one. *Swartwout v. Michigan Air Line R. R. Co.*, 24 Mich., 389; *Parker v. Northern Central Michigan R. R. Co.*, 33 Mich., 23; *Casey v. Galli*, 94 U. S., 673, 680; *Dutchess Cotton Manufactory v. Davis*, 14 Johns., 238; *All Saints Church v. Lovett*, 1 Hall, 191 [2d ed., 213]; *Leonardsville Bank v. Willard*, 25 N. Y., 574; *Eaton v. Aspinwall*, 19 N. Y., 119; *Methodist Episcopal Union Church v. Pickett*, id., 482; *Worcester Medical Institution v. Harding*, 11 Cush., 285; *Dooley v. Wolcott*, 4 Allen, 406; *Steam Navigation Co. v. Weed*, 17 Barb., 378; *Palmer v. Lawrence*, 3 Sandf. S. C., 161, 170; *Congregational Society v. Perry*, 6 N. H., 164; *Newburg Petroleum Co. v. Weare*, 27 Ohio St., 343; *Smith v. Sheeley*, 12 Wall., 358; *Lessee of Frost v. Frostburg Coal Co.*, 24 How., 278; *Bank of Salem v. Almy,*

117 Mass., 476; *Fay v. Noble*, 7 Cush., 188; *Trowbridge v. Scudder*, 11 id., 83; *Bennett v. Dean*, 35 Mich., 306; *Hawes v. Anglo-Saxon Petroleum Co.*, 101 Mass., 385.

Whether the defendants might or might not have been proceeded against in some other form, is a question I do not consider. According to the existing state of things, I am of opinion no case is made against them, and that the bank has no ground of complaint against the judge's direction to find for the defendants, and that the judgment ought to be affirmed with costs.

CAMPBELL, C. J., concurred.

COOLEY, J. I concur in the result.

MARSTON, J. (dissenting). Plaintiff in error brought an action of assumpsit, seeking to charge the defendants upon a promissory note purporting to be signed by "The Chas. Stone Timber Co." by its treasurer. Defendant Stone pleaded the general issue with notice of set-off, and he filed with his plea an affidavit denying the execution of the note.

It appeared on the trial that on September 16th, 1871, a written contract was entered into between Charles Stone of the first part and Livingstone & Hughes of the second part, by which, in consideration of the sum of fifty thousand dollars, Stone agreed to sell second parties a certain tract of land, also his stock in the Au Sable Boom Company, and all his rafting chains and rafting tools. The parties of the second part had the privilege of entering upon the land and cutting the pine timber thereon and selling the same, and to aid them in this the first party agreed to make certain advances. The second parties were to proceed vigorously to cut the pine upon the land, run, raft and sell the same, and from the proceeds thereof, one half was to be paid the first party, and to be applied, *first* in refunding advances made and interest thereon; and *second*, in payment of the contract price of the lands. On the 20th day

of September of the same year, some four days after the execution of this contract, these same parties had prepared and they had executed articles of association under the provisions of the act authorizing the formation of corporations for mining and manufacturing purposes.

The name of the corporation so formed was "The Charles Stone Timber Company;" its business, the cutting, rafting and manufacturing of timber; its capital stock $100,000, divided into 4000 shares of $25 each. The articles farther stated that the amount of capital actually paid in was $10,000; that Livingstone and Hughes each held 1800 shares and Stone 400 shares. The business was to be carried on in a number of counties in the northern part of the Lower Peninsula, the office to be in Detroit, its affairs managed by three directors, and to continue for thirty years. These articles were filed in the office of the Secretary of State and also in the office of the clerk of Wayne county.

A notice was published calling the first meeting of the stockholders. Livingstone and Hughes were present. They agreed they would call Mr. Stone president, Hughes vice-president and Livingstone secretary and treasurer. A rough memorandum in pencil was made of such an agreement, but no other or farther record. No other formal or other meeting of the stockholders was ever held, nor did the board of directors ever have a formal meeting. When they met they talked over matters, but kept no record of their proceedings. Books were kept by Livingstone in Detroit. They show no stock account, no capital account, a credit to Stone of $50,000, the contract price of the land and other things sold in the contract of September 16th; also $10,000 advances. Hughes kept books at Au Sable in the corporate name, connected with the business of getting out timber, payments to the men, etc. Nothing was ever paid in by any of these parties to the capital stock of the concern, unless what was said about putting in the chains and Boom Company stock can be so considered. What was

said and done in that respect can as well be stated in the language of the witness Mr. Livingstone, the treasurer of the company, as in any other way. He testified:

"The intention was that these chains and Boom Company's stock, to the amount of $10,000 at a fair valuation,—that they should constitute the first $10,000 of the capital stock put in; that was the intention at that time.

Q. Was there anything said about the necessity of putting it in?

A. Yes sir; I understood it was necessary to comply with the law; that before the articles were filed it was necessary that $10,000 should be put in. I think there were two or three things suggested about it. One was to have a check put in for $10,000 if I remember rightly, and then this was suggested, which, my impression is, Mr. Walker said was sufficient, and it was done in that way.

Q. What was done then about actually putting it in?

A. Nothing done that I particularly remember; it may be, but I am not certain. Mr. Stone gave Mr. Hughes an order on the Secretary of the Au Sable Boom Company to transfer the stock to the Charles Stone Timber Company."

Nothing further was ever done under these articles, except that work was at once commenced getting out long timber by Livingstone and Hughes under their contract with Stone and the terms of this contract were carried out by both parties substantially,—Stone making advances under it, and Livingstone and Hughes getting out the timber, selling it and making payments in accordance therewith.

The note in question was given in renewal of a note discounted to enable the business to be carried on as stated.

In each of the years 1872, '73 and '74, some twelve million feet of long timber was cut and rafted; large money transactions were had with the plaintiff in the name of the corporation, and the plaintiff was informed that the concern was a corporation.

In May, 1875, Stone by a written instrument requested the treasurer to transfer his stock, 200 shares, to Livingstone, and 200 to Hughes. No stock had ever been

issued. Hughes afterwards assigned his interest in the concern to Livingstone who afterwards failed, and his interest passed over to his assignee.

Under this state of facts it was claimed on the part of the plaintiff,

*First,* That this so-called corporation could have no existence under the laws of this State.

*Second,* That if it could have, it did not so organize and act as to have completed its legal existence.

On the part of the defendant it was insisted there was a corporation both *de facto* and *de jure;* that where articles have been framed and executed, with intent to form a corporation, substantially in the form required by law, there is at least a corporation *de facto,* and that its regularity can not be enquired into collaterally; that those who have dealt and contracted with a body as a corporation are estopped to deny its legal existence.

*First,* Were the purposes for which this corporation was formed, if at all, and the business afterwards carried on in the corporate name, authorized or contemplated by the statute under which the articles of association were drawn? The statute authorizes any number of persons not less than three, to associate under the provisions of the act, for the purpose of engaging in and carrying on any kind of mining or manufacturing business. The purpose for which such corporation is to be established, shall be distinctly and definitely specified in the articles of association, and it is made unlawful for the corporation to appropriate its funds to any other purpose. 1 Comp. L., §§ 2837, 2842.

The business of said association as set forth in the articles, "shall be the cutting, rafting and manufacturing of timber." The business carried on was that of getting out long round timber. In getting out this timber the trees were cut down, the branches cut off, and the tops cut off at a point where the log or timber would be not less than twelve inches in diameter. If the

tree was sound nothing further was required to be done except haul it to the river from whence it was run to the mouth and there rafted.

It was argued that a manufacture is literally anything made by the human hand; that the word is used to signify the process of making a thing, as well as a thing produced. And within the first meaning is included every step by which raw material is advanced towards fitness for human use. I fully concur with counsel that any attempt to draw a distinction between what is 'properly a manufactured article and what not, based upon a change in the form of the article in one case, or because in another, an article finished for a particular use had been produced, would rest on no sound principle and would be incorrect. And many of the illustrations given by counsel clearly show this to be so.

If however we take the other view and hold that the word "manufacturing" as used in the statute shall be used and applied in a strictly literal sense; that it "includes every step by which raw material is advanced towards fitness for human use," we would I think include a great many things that it would seem clear the Legislature never intended or contemplated.

We might have separate corporations formed for the manufacture of round timber, of logs, of telegraph poles and of cord wood; for manufacturing wheat and oats by cradling, cutting or reaping the standing grain; of hay, by mowing or cutting the grass; so the cutting, husking and shelling corn might each be separately classed as manufacturing. Indeed in getting out cordwood, several different corporations might be formed,—one to fell the timber, another to cut it into proper lengths, another to split it; each would be a distinct step by which the raw material would be advanced towards fitness for human use. And yet I think we might just as appropriately say that a cutting off of the branches from the tree after it was felled, was a manufacture of

brush, as to hold the above successive steps each a manufacturing within the meaning of the statute.

The true sense in which such words are used in a statute is to be ascertained not by a course of refinement, following out their literal signification, and thus leading to apparently absurd results, and giving them a meaning which the legislature evidently never intended or contemplated, but to give them their ordinary and popular signification, unless the words used have some technical signification.

In my opinion the business contemplated and for the carrying on of which these parties attempted to organize as a corporation, and in which they afterwards engaged, was one for the carrying on of which the statute did not warrant or authorize the formation or establishment of corporations. The purpose was not a manufacturing one within the meaning of the statute. I am aware that such statutes should not be construed in any narrow or illiberal spirit, but rather in a manner to promote the different forms of industry contemplated by the Legislature. There is however a wide difference between giving it such a construction, and one that would encourage the formation of mushroom corporations all over the State for any and all conceivable purposes that could be considered by any process of subtilty or refinement those of manufacturing. Parties attempting to form a corporation under a general statute of a State authorizing the formation of corporations for certain specified purposes, should be able to show clearly that the object and purpose for which they were formed, and the business which they were engaged in carrying on, was one clearly authorized by the statute. The tendency of our legislation in reference to the formation of corporations under general laws is quite liberal enough without being extended by construction; and although the business carried on by these parties was of sufficient magnitude and importance to justify the formation of a corporation for that purpose, yet this would be no

reason for our extending the statute by a judicial construction to embrace them, unless its terms would fairly warrant us in so doing. This I think it does not, and to have doubts upon the subject would be a sufficient reason for holding that the business carried on was one not authorized.

Was there in this case a corporation *de facto*, and is the plaintiff, who has dealt and contracted with the body as a corporation, estopped to deny its legal existence?

If parties may without color of law organize and establish corporations, or organize under a statute authorizing the formation of corporations for certain specific purposes, and without engaging in such business, enter into some other, wholly foreign to that for which they were apparently organized, and which the statute permitted, and hold parties who have dealt with them in their corporate name estopped from denying their corporate existence and authority to carry on the business in which they are engaged, it is clear to my mind that we would have a very curious condition of things.

To hold that the State only could by a direct proceeding question their corporate existence, power or authority, would afford but slight if any protection to parties having or likely to have dealings with them. In theory the protection might be considered ample, but in practice, with the number of corporations we would be likely to have all over the State, the actual protection afforded would be reduced to the lowest minimum. In my opinion the law does not go to this extent, and that it is not in every case where a person has contracted with a body in its corporate name that he is thereby estopped from denying its corporate existence in an action upon the contract.

In *Methodist Episcopal Union Church v. Pickett*, 19 N. Y., 482, SELDON, J., lays down the rule thus: "It has been repeatedly held, that as against all persons who have entered into contracts with bodies assuming to act in a corporate capacity, it is sufficient for such bodies to show themselves to be corporations *de facto*."

That two things are necessary to show a corporation *de facto*, viz.: *first*, the existence of a charter or some law under which a corporation, *with the powers assumed might lawfully be created*, and *second*, a user by the party to the suit, of the rights claimed to be conferred by such charter or law.

In *Oroville etc. v. Plumas County*, 37 Cal., 360, the court said: "It cannot be true that the mere allegation that a party is a corporation puts the question, whether it is such a corporation, beyond the reach of inquiry in a suit with a private person. It must be a corporation either *de jure* or *de facto*, or it has no legal capacity to sue or be sued, nor any capacity of any kind."

It was held in *Heaston v. The Cincinnati etc. R. R. Co.*, 16 Ind., 275, that upon the trial of an issue of fact under an answer of *nul tiel* corporation the proof is limited to the question of the existence *de facto* of a corporation, *under an authority sanctioning such a corporation de jure*. In other words, that mere irregularities in the organization cannot be shown collaterally *where there is no defect of power;* that upon the existence of a *de facto* corporation where one *de jure* is authorized, rests the doctrine of estoppel to deny the existence of a corporation in certain cases. The court says: "The estoppel goes to the mere *de facto* organization, not to the question of legal authority to make an organization. A *de facto* corporation, that by regularity of organization might be one *de jure*, can sue and be sued. And a person who contracts with such corporation, *while it is acting under its de facto organization*, who contracts with it as an organized corporation, is estopped, in a suit on such contract, to deny its *de facto* organization at the date of the contract; but this does not extend to the question of legal power to organize. Hence, if an organization is completed where there is no law, or an unconstitutional law, authorizing an organization as a corporation, the doctrine of estoppel does not apply. *Harriman v. Southam*, ante, p. 190; *Brown et al. v. Killian*, 11 Ind., 449. See 15 id., 395. So, if the plaintiff suing in a name

importing, *prima facie*, a corporation, in fact is not assuming to act as a corporation, but only as a partnership, this fact may be raised by an answer alleging want of parties in interest to the suit."

In *King v. Pasmore*, 3 Term, 244, Mr. Justice Ashhurst said: "A *scire facias* is proper where there is a legal existing body, capable of acting, but who have been guilty of an abuse of the power entrusted to them; and a *quo warranto* is necessary where there is a body corporate *de facto*, who take upon themselves to act as a body corporate, but from some defect in their constitution, they cannot legally exercise the powers they affect to use."

In *Leonardsville Bank v. Willard*, 25 N. Y., 575, the rule was laid down "that where a certificate of incorporation has been executed under a general law authorizing the formation of corporations in that manner, and there has been a user of corporate powers under color of the certificate, and the party setting up the want of corporate existence has recognized the corporation by transacting business with it as such, the proof is, *prima facie*, sufficient."

There are numerous cases holding that a person who has entered into contract relations with a *de facto* corporation, cannot in an action thereon deny its corporate character, or set up any informality in its organization, to defeat the action, and I in no way desire to question the correctness of such cases. The distinction between such cases and the present one is to my mind clear, and is one well recognized in the law. The general rule with the distinction was clearly recognized and laid down in *Swartwout v. Michigan Air Line R. R. Co.*, 24 Mich., 393, as follows: "Where there is thus a corporation *de facto, with no want of legislative power to its due and legal existence;* where it is proceeding in the performance of corporate functions, and the public are dealing with it on the supposition that it is what it professes to be, *and the questions suggested are only whether there has been exact regularity and strict compliance with the provisions of*

*the law relating to incorporation;* it is plainly a dictate alike of justice and of public policy, that in controversies between the *de facto* corporation and those who have entered into contract relations with it, as corporators or otherwise, that such questions should not be suffered to be raised;" and again on p. 395: "But both in reason and on authority the ruling should be the same where an attempt has been made to organize a corporation under a general law permitting it. *If due authority existed for the organization, and the question is one of regularity merely,"* then the rule is that parties who have recognized their existence by dealing with them, cannot object to the irregularity of their organization.

If the evidence showed that there was here a corporation *de jure,* and the offer had been to show a mere excess or abuse of its corporate powers, or, had it appeared that it was a *de facto* corporation, and the question related to the regularity of its organization merely, in either case I should have' no hesitation in saying that under the circumstances in this case the bank could not in this action question its corporate existence. The utmost that can be claimed for the corporation in this case, is that articles proper in form, but ambiguous as to the specific business to be carried on, were executed, and filed in the office of the Secretary of State, and with the clerk of the county in which the company's office was to be held, but not in the counties where the business was to be carried on; that at the time of its organization property of a certain value, as a compliance with the statute and their articles, was considered as put into the corporation, and a meeting called and held, at which two of the three interested parties were present and officers agreed upon but no record made thereof; that books were opened, but no entries made therein relating to corporate transactions. With the exceptions of what is here stated none of the usual and essential corporate acts were ever performed, and it is quite apparent that there never was any intention of performing them. The

business afterwards carried on in the corporate name by two of the so-called corporators, was foreign to the business authorized by the statute, and to their articles of association, if they can be considered sufficiently specific, (upon the theory that there might be a manufacture of some kinds of timber within the meaning of the statute). It cannot therefore in any proper or legal sense be said that the carrying on of such a business in the corporate name is evidence of user, which can be considered in aid of their legal corporate existence. Evidence of an excess of power, or carrying on of a business not authorized by the statute, cannot be shown in their favor for such a purpose.

No capital was ever put into the concern by Stone, unless his right to the use of the chains for a certain length of time can be so considered. He retained his apparent interest as a stockholder for some time and then requested that his interest be equally divided between the other two. He at no time had or claimed to have any real interest in this corporation. It seems to me clear from the evidence in the case that at no time did these parties ever intend to do more than formally organize under the statute, and that Stone's name was inserted as a stockholder in order to make up the lowest possible statutory number, without any intention on the part of any one that he should put anything into or have any voice or interest in the corporation or its management. It was to be a corporation in appearance, but not in fact. There were apparently to be three stockholders, but only two in fact. The business carried on was one which the two alone were interested in the profits of and bound to carry on under their contract with the other party. Whatever the object of these parties may have been in attempting an organization as a corporation, it was not I think to carry on business as a corporation and in observance of the provisions of the statute, in good faith, under which they professed to organize. And what was done in my opinion falls

far short of establishing a corporation *de facto*, in any view of the case.

In a case where a corporation can properly be organized under the statute, and the record exhibits a *bona fide* attempt to organize under it, very slight evidence of user beyond this is all that can be required. *Methodist Ep. Union Church v. Pickett*, supra.

I think the correct rule upon this subject of user was laid down in the dissenting opinion of ALLEN, J., in the case of *The Buffalo etc. R. R. Co. v. Cary*, 26 N. Y., 75. In this case the corporation was defectively organized under a general statute. All that had been done under the articles of association was, that the persons named as directors had come together and chosen from their number a president, secretary, treasurer and other officers. It was said "This was in no sense a user of any corporate franchise extended to the body as a corporation by the laws of the State. By thus getting together, calling themselves a corporation and electing officers, they did not become a corporation *quoad* third persons and the people, so that their corporate existence could only be questioned by the Attorney General upon a *quo warranto*. A single act in the exercise of the franchise claimed would not be a user, within the rule that makes a user evidence of corporate existence; still less is the preparation to enter upon the user sufficient to establish the existence of a corporation."

Had there been in this case a corporation *de facto*, engaged in carrying on a business apparently in accordance with the authority of their charter, and the bank had transacted business with them in relation thereto in their corporate name, I have no doubt but that it would be estopped from denying the existence of the corporation.

There was not however in my opinion such a corporation. The business carried on in the corporate name was one for the carrying on of which a corpora-

tion could not be organized under our statutes, so that the bank was in no way estopped from denying its corporate existence.

I think the court erred in instructing the jury to find a verdict in favor of the defendants.